*Julius Devincentz, Jr. v. State of Maryland*, No. 74, September Term, 2017, Opinion by Adkins, J.

**PRESERVATION FOR APPELLATE REVIEW — EXCLUSION OF EVIDENCE — MARYLAND RULES 5-103(A)(2) AND 8-131(A):** The Court of Appeals held that where the trial court sustains an objection to testimony that a witness has already given, excluding the testimony, and the substance and relevance of the testimony are apparent from the context, the proponent is not required by Maryland Rule 5-103(a)(2) to make a proffer regarding admissibility because the issue has been raised in and decided by the trial court and is preserved for review.

**EVIDENCE — EXCLUSION OF EVIDENCE — CHARACTER WITNESSES — CJP § 9-115 — MARYLAND RULE 5-608:** Md. Code (1974, 2013 Repl. Vol.), § 9-115 of the Courts and Judicial Proceedings Article ("CJP") and Md. Rule 5-608(a)(1) permit a character witness to testify either that another witness has a reputation for truthfulness or, in the character witness's opinion, the witness is an untruthful person. Provided that such testimony has an adequate basis, and the evidence is relevant, it is admissible. The Court of Appeals held that the trial court abused its discretion by excluding personal opinion testimony from a witness about another witness's character for truthfulness because an adequate basis existed, and witness credibility was relevant.

**EVIDENCE — EXCLUSION OF EVIDENCE — HEARSAY — MARYLAND RULE 5-616(B)(3) — NONHEARSAY EVIDENCE OF BIAS:** Maryland Rule 5-616(b)(3) permits impeachment by extrinsic evidence of bias, prejudice, interest, or other motive to testify falsely. Use of statements demonstrating a witness's bias for such impeachment purposes is not hearsay provided that the proponent offers it for the fact that the statement was made, not the truth of the statement and the testimony is relevant. The Court of Appeals held that the trial court erred by excluding a witness's statement that the State's witness was saying things she could do that would get the defendant in trouble because it was offered to show her bias and attack her credibility, rather than for the truth of the matter asserted. For that reason, the statement was not hearsay.

**CRIMINAL TRIALS — WITNESS CREDIBILITY — HARMLESS ERROR:** The Court of Appeals held that the exclusion of evidence pertaining to a witness's credibility was not harmless error. When credibility is an issue, particularly in cases in which the only evidence is testimony, the jury's assessment of which witnesses are truthful is critical. Because the evidence was critical to assessing the credibility of the State's witness, the exclusion of such evidence was not harmless error.

IN THE COURT OF APPEALS

OF MARYLAND

No. 74

September Term, 2017

JULIUS DEVINCENTZ, JR.

v.

STATE OF MARYLAND

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by Adkins, J.
Watts, J., concurs and dissents.

Filed: August 13, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

"[T]he trial of any case is a search for truth. The strength of each side of an issue rests upon the believability of the evidence offered as proof." *State v. Cox*, 298 Md. 173, 178 (1983). It is a fundamental principle of Maryland law that, in a criminal case tried before a jury, assessing a witness's credibility is a matter solely for the jury. *Bohnert v. State*, 312 Md. 266, 277 (1988). One method of attacking a witness's credibility is impeachment. In this opinion, we address two questions of Maryland evidentiary law pertaining to impeaching witness credibility. First, we consider whether a witness's statement that another witness "would not tell the truth about certain things[,]" was admissible as a personal opinion about that witness's character for untruthfulness. Second, we explore the admissibility of out-of-court threats as nonhearsay evidence of bias.

## FACTS AND LEGAL PROCEEDINGS

In 2008, Julius Devincentz, Jr. and Y.D. began a romantic relationship. Y.D., her daughter K.C., and her son S., moved into Devincentz's home in Elkton, Maryland from Pennsylvania. Devincentz's children, Brianna, Joshua, and Kenny also lived at the house. Devincentz and Y.D. lived together with their children as a blended family until the couple separated in November 2015.

In April 2015, K.C. left the Devincentz home and went to the Maryland Salem Children's Trust, a residential facility for juveniles. Some months into her stay, in September 2015, K.C. told her therapist that Devincentz had sexually abused her when she was six or seven years old. The therapist reported K.C.'s allegations.

The State charged Devincentz with one count of continuing course of conduct against a child, two counts of sexual abuse of a minor, one count of second-degree sexual

offense, one count of third-degree sexual offense, one count of fourth-degree sexual offense, and one count of second-degree assault. In 2016, Devincentz was tried in the Circuit Court for Cecil County.

K.C. was the State's primary witness. She testified that, on multiple occasions, when she was about seven years old, and nobody else was home, Devincentz

> would watch porn on our desktop computer in the living room, and he would ask me to come over and sit on his lap, and I would be scared and sometimes I would say no, and he would force me to sit on his lap, and he would touch me in my private area.

K.C. testified that Devincentz placed his hand underneath her clothes and underwear and touched the inside of her vagina for approximately 10 or 15 minutes. Afterward, Devincentz told her not to tell anyone. She also testified that Devincentz watched pornography on the computer while other members of the household were present. Two or three weeks after the first incident, Devincentz again digitally penetrated K.C. while she was in bed. K.C. told Devincentz that she did not like it, asked him to get away from her, and threatened to tell her mother. Devincentz gave K.C. a five-dollar bill and told her not to say anything.

K.C. also alleged that when she was around 10 or 12 years old, on several occasions, Devincentz offered her money to lift up her shirt. She always refused to do so. She testified that on one occasion he slapped and grabbed her bottom. K.C. explained that she did not report Devincentz's actions out of fear that she "was going to get physically hurt" and because she did not want to ruin her mother's relationship with Devincentz.

2

K.C. testified that she and Devincentz argued about her attitude, disputes with others in the household, her noncompliance with his requests to do chores, and her failure to do things the way he wanted. On cross-examination, K.C. acknowledged that she "was a very angry person," and that she "would butt heads a lot." K.C. explained that she clashed with Devincentz because "he was very demanding," she "didn't like the tone of voice he would use[,]" and "because he hurt" her. She attributed her difficulties with others in the house to the strain of keeping the abuse secret. K.C. stated that she did not get along with Joshua because he was "hardheaded," and he did not like her family. K.C. wanted to move back to Pennsylvania and live with her father. K.C. explained that she did not disclose the abuse earlier because she was afraid of Devincentz and Joshua. She stated that Joshua "posed a threat" to her, but that "nobody threatened [her]." Joshua would "scream at her and [get] in [her] face."[1]

After the State rested, defense counsel called Joshua. The State objected because defense counsel had not provided prior notice of the witnesses he planned to call and refused to proffer the subject matter of their testimony. Defense counsel contended that the State received notice because both witnesses were issued subpoenas. The State explained that it sought a proffer "because if these witnesses are character witnesses, this may open the door for impeachment purposes." The trial judge overruled the State's objection and permitted the defense to call its witnesses.

---

[1] The State called three other witnesses: (1) Andrea Hollern, K.C.'s therapist at the Maryland Salem Children's Trust; (2) Detective Lindsey Ziegenfuss of the Elkton Police Department; and (3) K.C.'s mother, Y.D.

Joshua testified consistently with K.C. about the composition of the Devincentz household. He explained that K.C. "never really liked [Devincentz]," she "didn't like [Devincentz's] rules . . . [and s]he wanted to be able to do whatever she wanted . . . ." Joshua witnessed arguments between Devincentz and K.C. Defense counsel attempted to elicit testimony about an argument that occurred after K.C. stole a cell phone. The State objected on the grounds of relevance. Defense counsel proffered that Joshua witnessed the argument and that "[i]t goes to motive." The trial judge ruled that Joshua could testify about the argument, but not about K.C.'s alleged theft because he lacked first-hand knowledge. The following exchange occurred:

> [**Defense Counsel**]: I asked you a question about the cell phone situation. Without characterizing how that came up, as a result of that argument, what occurred?
>
> [**Joshua**]: [K.C.] was unhappy with [Devincentz]'s decision on the argument. And once it was resolved by a third party**[, K.C.] was yelling and screaming and saying things that she could do that would get him in trouble.**
>
> [**Prosecutor 1**]: Objection.
>
> [**Prosecutor 2**]: Objection.
>
> **The Court**: Sustained.
>
> [**Defense Counsel**]: Now, were those things that you heard?
>
> [**Joshua**]: Yes.

(Emphasis added). Defense counsel did not make a proffer after the trial judge sustained the objection.

4

Joshua testified that he never saw anyone using the family computer to look at pornographic material and never saw such material stored on the computer. Defense counsel then asked about K.C.'s relationships with other family members.

> [**Defense Counsel**]: Now, would it be fair to say that [K.C.] had problems not only with [Devincentz,] but with other people in the family?
>
> [**Joshua**]: Yes.
>
> [**Defense Counsel**]: Would you describe what you mean by that?
>
> [**Joshua**]: [K.C.] had a problem with her mouth. [K.C.] would say things to people, about people, and then she would like to argue with you. **And she would not tell the truth about certain things.**
>
> [**The State**]: Objection.
>
> **The Court**: I'll sustain that. But [K.C.] would argue with people, right?
>
> [**Joshua**]: Yes.
>
> **The Court**: Okay.
>
> [**Joshua**]: And [K.C.] would give her side[,] and then there would be the other person's side.
>
> [**Defense Counsel**]: I have nothing further, Your Honor.

(Emphasis added).[2]

---

[2] Brianna Farris, Devincentz's stepdaughter, was the only other witness the defense called. She testified that she lived with Devincentz and Y.D. at the beginning of their

5

The jury found Devincentz guilty of sexual abuse of a minor and second-degree assault, but acquitted him of the charge of a continuing course of conduct against a child. The trial court sentenced him to 25 years in prison for the sexual abuse of a minor, and a consecutive 10 years for second-degree assault.[3]  Devincentz appealed.  In an unreported decision, the Court of Special Appeals affirmed his conviction.  *See Devincentz v. State*, No. 1297, Sept. Term 2016, 2017 WL 4231583 (Md. Ct. Spec. App. Sept. 25, 2017).

We granted *certiorari* to resolve the following questions[4]:

1.  Whether Devincentz preserved the issues for review.

relationship.  Farris corroborated Joshua's testimony about the family computer and arguments that K.C. had with family members.

[3] The trial court suspended the consecutive sentence for second-degree assault.

[4] Devincentz presented the following questions, which we have rephrased and re-ordered for brevity and clarity:

> 1.  Did the trial court err by prohibiting a defense witness who satisfied the evidentiary foundation required to provide character evidence from testifying that the complainant, the step-sister with whom the witness had shared a home for eight years, was an untruthful person?
>
> 2.  Did the trial court err by disallowing a defense witness's testimony that during an argument which he observed between the complainant and petitioner, the complainant threatened to get petitioner in trouble?
>
> 3.  Did the Court of Special Appeals err in holding that petitioner was required to make a formal proffer regarding the substance and relevance of the evidence at issue in order to preserve for appellate review claims 1 and 2 above, and that the exception to the proffer requirement did not apply, despite it being clear from the record what the testimony of the defense witness would have established if it had been admitted?

2. Whether the trial court erred by prohibiting a witness's testimony regarding the complainant's truthfulness.

3. Whether the trial court erred by prohibiting a witness's testimony about threats the complainant made during an argument with Devincentz.

We shall answer yes to all three questions.

## DISCUSSION

### Preservation

The State raises a recurrent appellate theme—preservation of issues. An appellate court will not "decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court . . . ." Md. Rule 8-131(a). The Court of Special Appeals concluded that Devincentz had not preserved either issue relating to Joshua's testimony for review because defense counsel did not make a proffer regarding the relevance or substance of the excluded testimony. *Devincentz*, 2017 WL 4231583, at *3. Devincentz and the State agree that the absence of a proffer does not bar appellate review when the substance and relevance of the excluded evidence is apparent from the context. Devincentz avers that Joshua's testimony and the circumstances of the trial satisfied these criteria, and the State disagrees. Maryland Rule 5-103(a)(2) requires that, to preserve a claim that a trial court erroneously excluded evidence, the party must be prejudiced by the ruling and "the **substance of the evidence was made known to the court by offer on the record or was apparent from the context within which the evidence was offered**." (Emphasis added).

7

The most common method of preserving a claim that the trial court erred is to proffer the substance and relevance of the excluded evidence. *Merzbacher v. State*, 346 Md. 391, 416 (1997); *see also Mack v. State*, 300 Md. 583, 603 (1984), *abrogated on other grounds by Price v. State*, 405 Md. 10 (2008). A proffer makes "the grounds for a different ruling manifest to the trial court at a time when the court can consider those grounds and decide whether to make a different ruling." *Peterson v. State*, 444 Md. 105, 124–25 (2015).

But a proffer is not an absolute requirement for preservation. Before the Maryland Rules of Evidence were adopted, in *Peregoy v. Western Md. Ry. Co.*, 202 Md. 203, 209 (1953), we explained that although

> ordinarily a proffer is desirable and sometimes indispensable to indicate the significance of the question and of the court's action in sustaining the objection, nevertheless, **where the tenor of the questions and the replies they were designed to elicit is clear, a proffer in the record is not a necessary prerequisite for a review** of the ruling.

(Emphasis added). Maryland Rule 5-103(a)(2) retains this exception by permitting review if "the substance of the evidence . . . was apparent from the context within which the evidence was offered."

We have examined the application of the preservation rule in Maryland. In *Merzbacher*, 346 Md. at 416, defense counsel attempted to elicit testimony from an Archdiocese official regarding whether any complaints had been filed against the defendant. Before the official could answer the question, the State objected, and the trial court sustained the objection. Merzbacher conceded the lack of proffer on appeal but insisted that the question elicited an obvious answer. We were unconvinced because the

8

witness "could have answered the question in any number of ways," and it was not evident that the witness's answer would have been relevant. *Id.*

Similarly, in *Conyers v. State*, 354 Md. 132, 163–64 (1999), Conyers contended that two of his witnesses should have been allowed to testify about a State witness's purported motive for testifying against Conyers, and that they warned Conyers about the witness's motives. We pointed out that the trial court sustained the State's objections before the witnesses could answer and Conyers never established the substance or the importance of the excluded evidence. *Id.* at 164. Despite Conyers's contentions, the likely answers were not at all "obvious." *Id.* His evidentiary presentation was riddled with defects that rendered the excluded testimony likely inadmissible, and ultimately, under the circumstances, even if the exclusion was in error, it was harmless. *Id.* at 165–66.

In *Peterson*, 444 Md. at 162, we held that defense counsel did not preserve the issue of whether the state could question a witness about his expected benefit from his testimony, when the witness had pending charges in Maryland and Virginia and had agreed to work as a police informant in Virginia. The trial court sustained the State's objections before the witness could answer the questions. *Id.* at 131–32. Defense counsel proffered the pending Virginia charges but nothing else. *Id.* at 131. We explained that "the proffer that made defense counsel's intention clear emerged in pieces and spurts," and in legal arguments before any witness had testified and after the witness had concluded his testimony. *Id.* at 141. Nor was it apparent that defense counsel had an adequate foundation to question the witness about an expected benefit. *Id.* at 141–42.

But *Peterson*, *Conyers*, and *Merzbacher* do not stand for the proposition that a proffer is mandatory. Rather, they illustrate when the contents and relevance of excluded evidence are insufficiently clear to preserve an issue for appellate review. In *Conyers* and *Merzbacher*, we declined to speculate about the contents of the excluded testimony. *Conyers*, 354 Md. at 164; *Merzbacher*, 346 Md. at 416. In *Peterson*, we observed that defense counsel's incomplete and drawn out proffer did not make it clear to the trial court what defense counsel intended to accomplish. 444 Md. at 141. Because the relevance and substance of the excluded evidence was unknown, the issues were not preserved.

*Jorgensen v. State*, 80 Md. App. 595 (1989), demonstrates when a claim of error relating to excluded evidence is preserved even without a proffer. Defense counsel sought to prove that a deputy did not seek the defendant's arrest until after the defendant and his brother planned to file administrative complaints against the deputy. *Id.* at 599. When defense counsel asked the deputy, and the defendant's brother, about the timing of the arrest warrant and the complaint, the State objected before the deputy could answer the question. *Id.* at 601. The witness's brother related some information about the timing before objections and a motion to strike curtailed his testimony. *Id.* at 601–02.

The Court of Special Appeals held that defense counsel's failure to proffer was not a fatal omission because "[t]he questions to which objections were sustained clearly generated the issue—what the examiner was trying to accomplish was obvious." *Id.* at 601. Jorgensen's opening statement clearly set forth his defense that the arrest was based on improper motivations. Thus, no proffer was necessary to preserve the issue for review. *Id.* at 602. The Court also concluded that defense counsel had established relevance

10

because the questions "were specific and did have special bearing on his credibility or bias." *Id.* at 604; *see also Taylor v. State*, 226 Md. App. 317, 378 (2016) (issue preserved without proffer because substance was apparent from context of precise questioning).

The State views *Jorgensen* as inapposite because, there, the contents of the question and the opening statement clearly presented the issue. But the Court of Special Appeals did not require that counsel provide a detailed exposition in opening statements—rather, it pointed to a portion of the statement that discussed the **general theory** of the case. *Jorgensen*, 80 Md. App. at 602. Here, the defense opening statement met the *Jorgensen* requirement by explicitly asserting that the defense intended to challenge K.C.'s credibility, and suggested she had ulterior motives for alleging that Devincentz abused her.

Unlike in *Conyers*, *Merzbacher*, and *Peterson*, we need not speculate as to what Joshua's testimony would have been. The State objected **after** Joshua answered each question. His answers clearly revealed the relevance of his testimony. Joshua's statement that K.C. "would not tell the truth about certain things" was obviously aimed at K.C.'s credibility—which defense counsel described as "the main issue in this case" during his opening statement. Joshua's testimony that, after an argument, K.C. was "saying things that she could do that would get [Devincentz] in trouble," was relevant to K.C.'s alleged motives and bias against Devincentz—and defense counsel, when addressing the admissibility of Joshua's testimony about the fight, argued that it was relevant to motive.

To be sure, counsel should make a proffer regarding excluded testimony. *See Robinson v. State*, 410 Md. 91, 103 (2009) ("Fairness and the orderly administration of justice is advanced 'by requiring counsel to bring the position of their client to the attention

11

of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.'" (quoting *State v. Bell*, 334 Md. 178, 189 (1994))).

But here, a proffer was not essential. The trial court heard Joshua's testimony **before** it sustained the State's objections, and the relevance was apparent from the context.[5] *See* Md. Rule 5-103(a)(2); *Peregoy*, 202 Md. at 209. We hold that Devincentz has preserved the issue of whether the trial judge properly excluded both portions of Joshua's testimony.

We next address the substance of the trial court's rulings excluding two pieces of testimony, beginning with Joshua's testimony that K.C. "would not tell the truth about certain things."

---

[5] The State complains that it was not clear that Joshua was testifying as a character witness because defense counsel "did not disclose what he planned to elicit from defense witnesses[,]" and did not give the State pretrial notice under Maryland Rule 4-263(e)(1).

The Rule does **not** require defense counsel to advise the State of the proposed subject matter of its witnesses' testimony. Defense counsel must provide the State's Attorney, "[w]ithout the necessity of a request," the "name and . . . address of each defense witness . . . together with all **written statements** of each such witness that **relate to the subject matter of the testimony of that witness**." Md. Rule 4-263(e)(1) (emphasis added). Defense counsel is not required to disclose the "identity and statements of a **person who will be called for the sole purpose** of impeaching a State's witness . . . until after the State's witness has testified at trial." *Id.* (emphasis added). Both Joshua and Brianna offered factual testimony. Joshua was not called solely to impeach K.C.'s testimony. Although defense counsel should have given the State notice of his witnesses in compliance with Md. Rule 4-263, he was under no obligation to proffer the subject matter of their testimony. *See id.* (e)(2)–(6) (identifying the types of witnesses and defenses that require defense counsel to furnish notice to the State). The State has not offered any other authority for this argument. As such, we do not find it persuasive.

12

**Joshua's Testimony Regarding K.C.'s Truthfulness**

We review a trial court's decision to admit or exclude a character witness's opinion for abuse of discretion.  *See Durkin v. State*, 284 Md. 445, 453 (1979).  "An abuse of discretion occurs where no reasonable person would take the view adopted by the circuit court." *Williams v. State*, 457 Md. 551, 563 (2018).  "Our determination of whether a trial court abused its discretion 'usually depends on the particular facts of the case [and] the context in which the discretion was exercised.'" *King v. State*, 407 Md. 682, 696 (2009) (quoting *Myer v. State*, 403 Md. 463, 486 (2008)).

Devincentz argues that the trial court abused its discretion when it excluded Joshua's testimony that K.C. "would not tell the truth about certain things."  He maintains that Joshua provided an opinion about K.C.'s character for truthfulness, which is relevant evidence admissible under Md. Code (1974, 2013 Repl. Vol.), § 9-115 of the Courts and Judicial Proceedings Article ("CJP") and Md. Rule 5-608(a)(1).  Devincentz contends that Joshua had an adequate basis to form an opinion about K.C.'s character for truthfulness based on the length and nature of their relationship, and Joshua's testimony was relevant because credibility was central to the case.

The State defends the trial court's ruling on grounds that Joshua's testimony was not a suitably formulated opinion.  The State insists that defense counsel also failed to establish how long Joshua and K.C. lived together, and that Joshua had personal knowledge of K.C.'s character for untruthfulness, thereby failing to prove an adequate basis.  Further, the State asserts that Joshua lacked a current basis for an opinion about K.C.'s character for truthfulness.

Md. Rule 5-608(a)(1) permits a character witness to attack the credibility of another witness by testifying either that the "witness has a reputation for untruthfulness," or "in the character witness's opinion, the witness is an untruthful person." A character witness may "give a reasonable basis" for his testimony, but may not, on direct examination, testify to specific instances. *Id.* (a)(3)(B).

CJP § 9-115 states:

> [w]here **character evidence is otherwise relevant to the proceeding, no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character**, either in person or by deposition, in any suit, action or proceeding, civil or criminal, in any court or before any judge, or jury of this State.

(Emphasis added). CJP § 9-115 modified the traditional rule limiting a character witness's testimony about another witness's character for truthfulness to testimony about the "general reputation in the community for veracity of the witness under attack." *Durkin*, 284 Md. at 448–49. Under CJP § 9-115 and Md. Rule 5-608, a character witness may offer his opinion of another witness's character for truthfulness and the basis for that opinion. *See Jensen v. State*, 355 Md. 692, 707–08 (1999).[6]

We first consider whether Joshua's testimony was, in fact, an opinion about K.C.'s character. Although it concluded Devincentz had not preserved the issue for review, the

---

[6] Despite the flexibility this statute offers, a party may not use Md. Code (1974, 2013 Repl. Vol.), § 9-115 of the Courts and Judicial Proceedings Article ("CJP") to indirectly shepherd inadmissible evidence before a jury. *Kelley v. State*, 288 Md. 298, 302 (1980).

14

Court of Special Appeals determined that Devincentz's counsel "sought to elicit—and indeed did elicit—[Joshua's] opinion about the victim's truthfulness." *Devincentz*, 2017 WL 4231583, at *2. The State relies on *Jensen* and contends that, "at best" Joshua testified merely about his basis for a character opinion.

In *Jensen*, 355 Md. at 695, Brian Wooldridge testified for the State. Defense counsel called Melissa Goff to impeach Wooldridge's credibility. Goff testified that she had known Wooldridge for approximately a year and he would tell her a lot of stories that "didn't add up . . . ." *Id.* at 696–97. The trial court found that Goff had an adequate basis to provide an opinion of Wooldridge's character for veracity. *Id.* at 697. When asked for her opinion, Goff announced that Wooldridge was a "compulsive liar." The trial court sustained the inevitable objection and did not permit Goff to testify about the basis for her opinion. *Id.*

On appeal, we rejected the State's claim that permitting Goff to testify about the basis for her opinion violated Md. Rule 5-608(a)(3)(B) because her direct testimony impermissibly discussed specific instances of conduct by tying events together. *Id.* at 698–99. Rather, Goff testified "as a **general matter**, to Wooldridge's tendency to tell mutually inconsistent stories, *i.e.*, his **general tendency to be untruthful**." *Id.* at 699 (emphasis added). We explained that Md. Rule 5-608 prohibits specific instance testimony on direct because, while convincing, it has the capacity for prejudice, surprise, confusion, and is time-consuming. *Id.* at 699–700. Because Goff's testimony "spoke to a **general trait and not to particular occasions on which [the witness] lied**, it would not serve to distract and confuse the jury, nor would it consume time by altering the focus of the trial to other

15

particular events."[7] *Id.* at 700 (emphasis added). A character witness, we explained, may offer more than a "bare conclusion" regarding a witness's character for untruthfulness— she is "entitled to some latitude in informing the jury as to the basis for an opinion, so long as that person avoids venturing into the troublesome area of specific instances." *Id.* at 708.

Like the witness in *Jensen*, Joshua testified to a "general behavior pattern." *Id.* at 699. Joshua did not offer specific instances when he said K.C. "would not tell the truth about certain things." His testimony fits within *Jensen*. He did not inject particulars that could distract the jury, waste time, or cause undue prejudice. It was consistent with the purposes of Md. Rule 5-608. *See id.* at 699–700. Although Joshua did not say, "In my opinion, K.C. is not a truthful person," he testified—as he was permitted—that K.C. argued with family members and was untruthful about certain things.

To be sure, it is a better practice to frame opinion testimony with greater precision, but the State's insistence that such testimony is **only** acceptable upon the use of formulaic phrases is inconsistent with the intent of CJP § 9-115. As we explained in *Kelley v. State*, 288 Md. 298, 302 (1980), CJP § 9-115 "permits the admission of a broad range of testimony[,] which may aid the jury in assessing the credibility of a witness . . . ." The State has not offered Maryland authority showing that it is necessary to phrase questions

---

[7] We determined that excluding Goff's testimony was harmless error. *See Jensen v. State*, 355 Md. 692, 716–17 (1999).

16

or opinions as it proposes.[8] For these reasons, we conclude that Joshua offered an opinion about K.C.'s character for truthfulness.[9]

CJP § 9-115 sets forth two conditions that must be met before opinion testimony is admissible. First, character evidence must be "otherwise relevant to the proceeding." *Id.* Second, the witness must have an "adequate basis" to form that opinion. As we explained

---

[8] The State relies on *United States v. Marshall*, 173 F.3d 1312 (11th Cir. 1999), but that case is inapposite. There, on cross-examination, a DEA agent acknowledged that the Government's informant had multiple sources for cocaine. On redirect, the Government asked whether the agent believed that the cocaine the informant had in his possession came from a source other than the defendants. The agent, over defense counsel's objections, said he did not. *Id.* at 1315. The Eleventh Circuit concluded that the agent's answer was inadmissible because he lacked personal knowledge regarding the origin of the cocaine the informant provided. *Id.* The Government argued that the agent's testimony was admissible under Federal Rule of Evidence 608(a)(2) to rehabilitate the informant's credibility. The Eleventh Circuit explained that the prosecutor's question was directed to the source of the cocaine and was "only indirectly a question regarding [the informant's] truthfulness." *Id.* If the Government intended to rehabilitate the informant's credibility, then it should have posed questions to that end, rather than attempting to use the wrong rule to admit impermissible testimony. *See id.* at 1315–16.

[9] The State contends that Joshua's testimony was not responsive. Defense counsel asked Joshua if K.C. "had problems . . . with other people in the family[.]" When Joshua affirmed that she did, counsel asked Joshua to "describe what [he] mean[t] by that[.]" Joshua testified that "[K.C.] had a problem with her mouth. She would say things to people, about people, and then she would like to argue with you. And she would not tell the truth about certain things." The State insists that only the first two sentences answered the question, but acknowledged before this Court, that the transcript **does not** indicate a pause or break in the testimony. First, "it is not a matter of right to have answers stricken out because [they are] not responsive, if otherwise unobjectionable, except at the instance of the questioner." *Standard Gas Equip. Corp. v. Baldwin*, 152 Md. 321, 325 (1927); *see also Beads v. State*, 422 Md. 1, 15 (2011). Second, the sentence in question was responsive. Having a family member who would not tell the truth about certain things would doubtless cause problems in most families. We are not convinced that the State could have reasonably sought to exclude Joshua's testimony on this ground.

in *Durkin*, 284 Md. at 452, "the adequacy of the basis relates to whether the personal opinion shall be 'excluded,' and not merely to the weight of the personal opinion testimony." *See also Jensen*, 355 Md. at 707 (CJP § 9-115 has no "express limitations beyond requiring a witness to have an adequate basis before testifying"). The trial judge determines whether these conditions are satisfied. *Durkin*, 284 Md. at 453. Provided these conditions are met, the defendant is entitled to elicit personal opinion testimony. *See Void v. State*, 325 Md. 386, 391–92 (1992).

To assess when a witness has an adequate basis to offer a personal opinion about another witness's character, we draw a distinction between the foundation required for opinion testimony as opposed to reputation testimony. Reputation testimony requires showing that the witness is familiar with the individual's reputation in the relevant community. *See Allison v. State*, 203 Md. 1, 7–8 (1953); *Braxton v. State*, 11 Md. App. 435, 440 (1971).[10]

A witness, like Joshua, who offers a personal opinion has a different foundation requirement because he provides a personal assessment of another's character. *See United States v. Watson*, 669 F.2d 1374, 1382 (11th Cir. 1982). Because the witness describes his own impressions, the core requirement for such testimony is that the witness must have personal knowledge of the individual. *Id.* The witness's lack of familiarity, reliance on isolated incidents, or bias may be exposed on cross-examination. *Id.* (citing 3 *Weinstein's*

---

[10] Specifically, he must have a "sufficient acquaintance" with the individual and the community to ensure that his testimony "adequately reflects the community's assessment." *United States v. Watson*, 669 F.2d 1374, 1382 (11th Cir. 1982).

18

*Federal Evidence* Art. 608(04), at 608-20 (1981)). *See also United States v. Lollar*, 606 F.2d 587, 589 (5th Cir. 1979).

We have offered some guidance regarding an adequate basis to offer personal opinion testimony. Abbreviated encounters with an individual that do not furnish an opportunity to evaluate his or her credibility do not provide an adequate basis. *See Durkin*, 284 Md. at 453–54 (no abuse of discretion to exclude opinion testimony from a police chief concerning a witness's character for truthfulness based only on chief's "brief and limited encounter" during which he decided that the witness had filed a false police report). *See also Booth v. State*, 327 Md. 142, 192 (1992) (no abuse of discretion to exclude probation officer's opinion that witness was an untruthful person without evidence that her opinion would be based on anything more than the contents of his probation record); *Kelley*, 288 Md. at 303–04 (abuse of discretion to admit opinion from polygraph examiner that witness was not telling the truth after a two-hour interview).

A witness has an adequate basis for personal opinion character testimony when the witness has regular contact with the person whose character she is evaluating, and reason to believe that the person has not been truthful. *See Jensen*, 355 Md. at 695–99 (character witness had reasonable basis to offer opinion testimony based on year-long acquaintance and regular contact with other witness); *Barnes v. State*, 57 Md. App. 50, 59 (1984), *cert. denied*, 299 Md. 655 (1984) (no abuse of discretion to admit police officer's personal opinion testimony because he was acquainted with the witness, had interviewed her repeatedly, and had reason to believe she was not truthful).

In *Booth*, 327 Md. at 192, we explained that the adequate basis inquiry must, at a minimum, elicit how long and how well the witness has known the individual.[11]  *See also Honey v. People*, 713 P.2d 1300, 1302 (Colo. 1986) (en banc).  Neither Md. Rule 5-608 or CJP § 9-115 require a particular length of acquaintance or basis of knowledge.  Nor have other jurisdictions established a minimum length of acquaintance to offer opinion testimony—the court making the assessment "may consider how well the witness knows the witness to be impeached and under what circumstances the witness giving the opinion knew the [other] witness . . . ."  *Honey*, 713 P.2d at 1302.  *See also Watson*, 669 F.2d at 1382; *Lollar*, 606 F.2d at 589; *United States v. Mandel*, 591 F.2d 1347, 1370–71 (4th Cir. 1979), *vacated on other grounds by* 602 F.2d 653 (4th Cir. 1979) (en banc), *cert denied* 445 U.S. 961 (1980); *State v. Gelinas*, 279 A.2d 552, 554 (Conn. 1971); *State v. Eldred*, 559 N.W.2d 519, 528 (Neb. App. 1997).

Here, the evidence presented at trial established the length and nature of Joshua and K.C.'s acquaintance.  Both Devincentz **and** the State presented testimony, from K.C., Y.D., and Joshua, establishing that Joshua and K.C. resided in the same home for over six years, and that Joshua had known K.C. since she was six or seven years old.[12]  Both Joshua and K.C. testified about the household, that they argued with each other, and that K.C. had

---

[11] Despite the **minimum** requirements, Maryland Rule 5-608 and CJP § 9-115 do not contemplate restricting testimony about the adequacy of the witness's basis **solely** to "the length and manner of acquaintance."  *Jensen*, 355 Md. at 707.

[12] At trial, K.C. estimated that she lived in Devincentz's home for "about eight years."  She testified that she moved into the home in October 2008.  She left for the Salem Children's Trust in April 2015.  Thus, K.C. actually lived in Devincentz's home for approximately six and a half years, rather than eight.

disagreements with other family members. As a member of the household, Joshua was reasonably familiar with the family dynamics and would have had first-hand knowledge of at least **some** of K.C.'s problems with family members—and his testimony was based on his observations. *See United States v. Turning Bear*, 357 F.3d 730, 734 (8th Cir. 2004) (defendant laid sufficient foundation for witness's testimony about victim's character for untruthfulness because victim lived with witness for four to six months and they had daily contact). Thus, he had sufficient contact with K.C. to form an opinion about her truthfulness. Indeed, our cases demonstrate that witnesses with shorter and less personal acquaintances have offered opinion testimony. *See, e.g.*, *Jensen*, 355 Md. at 695–97; *Booth*, 327 Md. at 192; *Barnes*, 57 Md. App. at 59.

The State maintains that, despite the length of their acquaintance, defense counsel did not "elicit how current the basis for Joshua's opinion was." The State contends that any opinion Joshua formed about K.C.'s character for truthfulness would relate to at least a year before trial, if not more. Because Joshua's opinion was "relevant only to the extent that it informed the jury about [K.C.'s] veracity at the time of the June[] 2016 trial," the State reasons the trial court was within its discretion to exclude Joshua's testimony.

Neither party points to Maryland authority that offers guidelines for how current the basis for an opinion must be—or its relationship to relevance. Recently in *Fallin v. State*, __ Md. __, 2018 WL 3410022, at *12 (Md. Ct. App. July 12, 2018), we explained that to offer an opinion about a witness's character for untruthfulness, the character witness "must establish **past knowledge** of the witness . . . ." (Emphasis added). Such knowledge is necessary to form a current opinion about the "general reputation or propensity of the

21

witness to tell the truth." *Id.* Moreover, Maryland Rules 5-608(a) and 5-616(b)(5) do not require a party to establish when a witness formed his opinion of another's character.

Professor McLain explains that opinion or reputation testimony about a witness's character for truthfulness "must concern a time pertinent to the witness's testimony at trial." 6 Lynn McLain, *Maryland Evidence State and Federal* § 608:2, at 591 (3d ed. 2016). But "pertinence" simply requires that the opinion be **relevant** to the impeached witness's testimony at trial. *See The American Heritage Dictionary of The English Language* 1312 (4th ed. 2006) ("Pertinent" means "[h]aving logical precise relevance to the matter at hand").

*McCormick on Evidence* explains that although the "crucial time when a witness's character influences his truth-telling" is at the time of testimony, reputation and opinion "**take[] time to form and are the result of the witness's earlier conduct**." 1 Kenneth S. Broun et al., *McCormick on Evidence* § 43, at 282 (7th ed. 2013) (emphasis added). Thus, such testimony does not "reflect character precisely at the trial date." *Id.* A witness may testify about another witness's reputation or opinion at the time of trial, and pre-trial time periods that the trial court decides, as a matter of discretion, are not too remote. *Id.* at 282–83. *See also* 3A Wigmore, *Evidence in Trials at Common Law* § 928, at 754–55 (Chadbourn rev. ed. 1970) (emphasis added) ("The only limitation to be applied would be . . . that the character **must not be so distant in time to be void of real probative value in showing present character**; this limitation to be applied in the discretion of the trial court[.]").

Other jurisdictions have concluded that character evidence must be relevant to the time of trial, but "the sources of the information of the impeaching witness **must necessarily more or less extend back into the past and considerable latitude is allowed in regard to time**." *State v. Thomas*, 113 P.2d 73, 77 (Wash. 1941) (emphasis added). Whether testimony is too remote to have probative value depends on the unique circumstances of each case. *Id.*

The admissibility of past character to prove present character depends on whether, "in the discretion of the trial court, the contacts on which the opinion is based are frequent enough *and* recent enough to have probative value to the testimony given in court." *State v. Maxwell*, 18 P.3d 438, 446–47 (Or. App. 2001) (emphasis in original). In *State v. Colon*, 284 P.3d 589, 594 (Or. App. 2012), the Court of Appeals of Oregon explained that to satisfy this standard, a party must show "adequate contacts" between the witnesses to allow the impeaching witness to "form a current personal opinion of the [other's] character for truthfulness." In *Maxwell*, 18 P.3d at 446, the Court of Appeals of Oregon concluded that the trial court abused its discretion when it found that a witness at a 1997 trial who had personal contact with the other witness 40 to 50 times from 1994 to 1996 lacked an adequate basis to form an opinion of her character for truthfulness. In *Colon*, 284 P.3d at 594, the same court determined that the trial court abused its discretion in concluding that the defendant had not laid a sufficient foundation when the witness had known the complainant his whole life, had spent substantial time with her, and had seen her near the time of the alleged assault that was the subject of trial.

23

On the other hand, in *State v. Paniagua*, 341 P.3d 906, 910 (Or. App. 2014), the Court of Appeals of Oregon determined that a trial court did not abuse its discretion in excluding opinion testimony when the witness had limited contact with the individual to be impeached in the past year, there was no testimony about the nature of their contacts earlier in their acquaintance, and the witness formed her opinion in part based on others' assessment of the individual's character for truthfulness. *See also State v. Lopes*, 767 A.2d 673, 677 (R.I. 2001) (trial court did not abuse discretion excluding opinions of two adult witnesses that defendant was trustworthy with children because opinions arose from interactions 14 years before trial and witnesses had no knowledge of defendant's current interactions with children); *State v. Goodnow*, 649 A.2d 752, 755 (Vt. 1994) (no abuse of discretion to exclude opinion about victim's character for truthfulness when character witness's opinion was based on events six to eight years earlier and witness and victim had not seen each other since).

The issue, as other courts have analyzed it, does not turn on **when** the witness formed his opinion about the individual's character for truthfulness.  Instead, it centers on whether the witness had sufficient contacts with that individual to form a personal opinion, and if the **contacts** were recent enough to be probative of the individual's character for truthfulness.  Applying a similar analysis here, we evaluate whether it was within the trial court's discretion to conclude that, because K.C. last resided in the Devincentz home 14 months before trial,[13] Joshua's opinion was too distant to be probative of her character for

_____

[13] K.C. testified that she went to the Salem Children's Trust in April 2015. Devincentz was tried in June 2016.

24

truthfulness. We review the trial court's rulings on these matters for an abuse of discretion. *See Durkin*, 284 Md. at 453. Under such standard, we do not reverse "simply because the appellate court would not have made the same ruling." *North v. North*, 102 Md. App. 1, 14 (1994). Rather, the trial court's decision must be "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Id.* A court abuses its discretion when:

> the ruling under consideration appears to have been made on untenable grounds, when the ruling is clearly against the logic and effect of facts and inferences before the court, when the ruling is clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result, when the ruling is violative of fact and logic, or when it constitutes an untenable judicial act that defies reason and works an injustice.

*Id.* at 13–14 (cleaned up).

As we explained above, the testimony established the length and nature of Joshua and K.C.'s relationship and that it was the kind of relationship that would lend itself to assessing the character of another for truthfulness. *See Turning Bear*, 357 F.3d at 734. Joshua's opinion about K.C.'s character for truthfulness arose from a time pertinent to trial—when K.C. resided in the Devincentz household. His **current** opinion of K.C.'s veracity was necessarily based on **past** events. *See Fallin*, __ Md. at __, 2018 WL 3410022, at *12; *Thomas*, 113 P.2d at 77; 1 *McCormick*, *supra*, at § 43, at 282. It is difficult to see how, under these circumstances, 14 months could tenably be seen as so distant that it rendered Joshua's testimony about K.C.'s character too remote to be probative.

Decisions from Maryland and other jurisdictions reflect that character simply does not change so fast (if at all), that, for legal purposes, a year can be deemed too remote. For

25

example, in *Jensen*, 355 Md. at 695–96, the witness offered an opinion of another's character for truthfulness based on contacts approximately a year before trial. *See also Colon*, 284 P.3d at 594; *Maxwell*, 18 P.3d at 445–46. For this reason, we hold that to the extent the trial court excluded Joshua's opinion for lack of an adequate basis, it was an abuse of discretion to do so.

In addition to an adequate basis, **CJP § 9-115 requires that character evidence be relevant to a proceeding**. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. We have recognized that a witness's credibility is **always** relevant. *Smith v. State*, 273 Md. 152, 157 (1974). When the trier of fact must rely primarily—if not solely—on witness testimony to assess guilt or innocence, credibility takes on greater importance. *See State v. Cox*, 298 Md. 173, 185 (1983). Here, Joshua's opinion about K.C.'s character for truthfulness was unquestionably relevant for the jury's determination of whether K.C.'s testimony was credible. *See Fallin*, __ Md. at __, 2018 WL 3410022, at *12.

*King v. State*, 407 Md. 682, 706–07 (2009), is also instructive. Darryl King was tried for the attempted murder of Kevin Phillips. The State's primary witnesses were Phillips, and his fiancé, Terri Lagarde. King's theory of defense was that Phillips and Lagarde falsely implicated him in the shooting because of interpersonal difficulties. *Id.* at 686–87. King successfully impeached Phillips with a felony conviction, *id.* at 690, and similarly sought to impeach Lagarde. The trial court denied the impeachment, concluding that the danger of unfair prejudice outweighed any probative value. *Id.* at 692–93.

26

We reversed, holding that the trial court abused its discretion when it did not permit King to impeach Lagarde because the court did not consider significant aspects of the record in reaching its decision. *Id.* at 706–07. As in this case, the State constructed its case based on witness testimony and there was no forensic evidence. *Id.* at 707. Thus, like here, impeachment had high probative value. *Id. at* 702. Also, Phillips's narrative was "not consistent or solid," so Lagarde's corroboration was significant. *Id.* at 707. Lagarde's relationship to Phillips offered a possible motive to prevaricate about the circumstances of the shooting, and her conduct at the time of the shooting was unusual.

Here, the evidence at trial established that the length and nature of Joshua and K.C.'s acquaintance was one that would permit Joshua to form an opinion about K.C.'s character for truthfulness. As we have discussed, living in the same household with K.C. for six years provided ample basis for Joshua's opinion. Devincentz was, under CJP § 9-115, entitled to "elicit the personal opinion of his witnesses to prove the character of the witness against him[,]" provided he satisfied the statute's conditions. *Void*, 325 Md. at 391–92; *see also Jensen*, 355 Md. at 708 (trial court abused discretion by limiting witness's testimony to description of acquaintance and conclusion that he was a liar because Md. Rule 5-608 and CJP § 9-115 offer witnesses "latitude" in explaining basis for opinion). Further, K.C.'s credibility was integral to the proceeding—as both the State and Devincentz recognized. We conclude that the decision to exclude Joshua's opinion for lack of an adequate basis was inconsistent with the available facts in the record. *See King*, 407 Md. at 707. Accordingly, we hold that the trial court abused its discretion when it excluded Joshua's testimony.

27

We next consider whether the trial court erred in excluding Joshua's testimony about a fight between K.C. and Devincentz, and K.C.'s implied threat to do things that would get Devincentz in trouble.

**Joshua's Testimony About the Fight and K.C.'s Implied Threat**

Devincentz argues that the Circuit Court should not have sustained the State's objections to Joshua's testimony that K.C. "was yelling and screaming and saying things that she could do that would get him in trouble." Devincentz maintains that such testimony is admissible nonhearsay evidence of bias because it was not offered for the truth of the matter asserted, and bias is always relevant.[14] The State responds that Joshua's testimony was inadmissible hearsay because it was offered for the truth of the matter asserted—that K.C. would get Devincentz in trouble.

Although we ordinarily apply the abuse of discretion standard when reviewing evidentiary rulings, whether "evidence is hearsay is an issue of law reviewed *de novo*." *Bernadyn v. State*, 390 Md. 1, 8 (2005). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). In any hearsay analysis, the first step is to identify what the extrajudicial statement was offered to prove. *Bernadyn*, 390 Md. at 9. If a declaration is not "offered for the truth of the matter asserted, it is not hearsay and it will not be excluded under the hearsay rule." *Stoddard v. State*, 389 Md. 681, 689 (2005).

---

[14] Secondarily, Devincentz argues that, even assuming K.C.'s statement was hearsay, it was admissible through the "statement of intent" exception.

28

Joshua testified that he witnessed the dispute, and that "[K.C.] was unhappy with my father's decision on the argument. And once [the argument] was resolved by a third party, she was yelling and screaming and **saying things that she could do that would get him in trouble**."[15] (Emphasis added). He had first-hand knowledge, based on his observations, about K.C.'s behavior during the fight. *See Walker v. State*, 373 Md. 360, 388 n.8 (2003) ("[T]he threshold standards for calling any fact witness are merely that the witness have personal knowledge of the matter attested to and that the matter be relevant to the case at hand.").

Devincentz's defense was that K.C. was not credible because she disliked Devincentz and the rules he imposed, and she used allegations of criminal conduct to leave his house and return to Pennsylvania.[16] Defense counsel contended that the argument "goes to her motive as to why we're here." He proffered that Devincentz told K.C. to return the phone, triggering an argument that Joshua witnessed. Ultimately, Devincentz sought to

---

[15] The State maintains that this testimony was also unresponsive because it posits that defense counsel's question was "intended to elicit that K.[C.] was unhappy because she was forced to return the cell phone, not that K.[C.] made verbal threats." To support this position, the State points to defense counsel's proffer that Devincentz told K.C. to return the cell phone and that they had an argument about it. But defense counsel asked Joshua, "[A]s a result of that argument, what occurred?" This question encompasses the testimony Joshua provided in response because "what occurred" is a broad invitation to describe a set of circumstances. Accordingly, Joshua's testimony was responsive. *See also* note 9, *supra*.

[16] In the initial discussion of the admissibility of Joshua's observation of the fight, the State objected to Joshua's statement that the fight originated over a stolen cell phone because references to an alleged theft were not appropriate.

prove not that K.C. could, in fact, get him in trouble—that was hardly in dispute—but rather that her allegations stemmed from bias.

Maryland Rule 5-616(b)(3) permits impeachment by "[e]xtrinsic evidence of bias, prejudice, interest, or other motive to testify falsely . . . whether or not the witness has been examined about the impeaching fact and has failed to admit it." *See Pettie v. State*, 316 Md. 509, 514 (1989) ("[I]t is well established that the bias, hostility[,] or motives of a witness are relevant and are admissible for purposes of impeachment.").

We have recognized that "[u]se of a statement for impeachment purposes is not hearsay, since **only the fact that the statement was made is being offered**, not the truth of the statement." *Smith*, 273 Md. at 161 (emphasis added); *see also Handy v. State*, 201 Md. App. 521, 540 (2011), *cert. denied* 424 Md. 630 (2012) (extrajudicial statement was not hearsay when offered for purpose of assessing witness credibility); 6A McLain, *supra*, at § 801:13, at 256 ("A witness's out-of-court statements offered not as substantive proof but for the purposes of impeachment or rehabilitation of the witness's credibility are not hearsay.") (footnotes omitted); Roger Park & Tom Lininger, *The New Wigmore: A Treatise on Evidence: Impeachment and Rehabilitation* § 6.1, at 245 (2012) (hearsay objections rarely prohibit bias impeachment because statements are usually non-hearsay or satisfy the state of mind exception). Provided that the evidence is relevant, it may be admitted for impeachment. *Aron v. Brock*, 118 Md. App. 475, 497 n.5 (1995), *cert. denied* 346 Md. 629 (1997).

In *Smith*, 273 Md. at 155, this Court considered whether the trial court erred by prohibiting impeachment of a State's witness based on a prior inconsistent statement. The

victim purportedly told the witness, a police officer, that the shooting was accidental, a fact that the officer relayed to a member of the public defender's staff. *Id.* at 154–55. On cross-examination, the officer denied making the statement. Defense counsel proffered that the staff member would testify to what the officer told him for impeachment purposes. *Id.* The trial court concluded it was double hearsay and refused to allow the testimony. *Id.* at 155.

Reversing the trial court, we explained that a witness's credibility is always relevant. *Id.* at 157. The officer's prior statement—that the victim told him the shooting was accidental—was "clearly relevant[.]" *Id.* at 160. Our resolution in *Smith* turned on the **purpose for which the evidence was offered**. The police officer's statement was **not** offered for its truth, but "only to impeach his testimony by showing that he made such a statement which he now denies." *Id.* at 161. Therefore, we concluded, his statement was not hearsay at all—it was offered to show that he **made** the statement—and was admissible. *Id.*

Similarly, *State v. Calabrese*, 902 A.2d 1044, 1055 (Conn. 2006), demonstrates that threats by a complainant to get an accused in trouble are admissible nonhearsay evidence of bias. There, messages left by a complainant on the defendant's answering machine were not offered for the truth of the matter asserted, but "merely for the fact that those statements had been made." *Id.* The complainant threatened to get the defendant in trouble if he failed to comply with her requests. *Id.* at 1053 & n.17. The Supreme Court of Connecticut concluded that the messages were "admissible nonhearsay evidence" under the Connecticut Code of Evidence's provision permitting impeachment of a witness's

credibility through evidence of bias or prejudice that might cause the witness to testify falsely.[17] *Id.* at 1055. Such evidence, the Court concluded, demonstrated that the complainant had sufficient hostility towards the defendant to motivate her to falsely accuse the defendant of harming her. *Id.*

*Smith* and *Calabrese* demonstrate how a proffered statement containing apparent hearsay is not itself hearsay if offered to show bias of a witness, rather than the truth of the third-party statement. *Smith*, 273 Md. at 161; *Calabrese*, 902 A.2d at 1055. Such statements are only offered to show that the statements were made—and they may be used to undermine a witness's credibility by demonstrating bias or inconsistency.

"It is well established that the bias, hostility[,] or motives of a witness are relevant and proper subjects for impeachment." *Pantazes v. State*, 376 Md. 661, 692 (2003).

> Bias describes the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias includes prejudice against the plaintiff, partiality towards the defendant, or an interest in the litigation. A motive to lie or testify falsely is also included in the notion of bias. Proof of bias may be used to attack a witness'[s] veracity or the reliability of his or her testimony.

*Id.* at 692–93 (cleaned up). As the Supreme Court explained in *United States v. Abel*, 469 U.S. 45, 52 (1984), "[p]roof of bias is **almost always relevant** because the jury, as finder of fact and **weigher of credibility**, has historically been entitled to assess **all evidence**

---

[17] *Compare* Md. Rule 5-616(b)(3) ("Extrinsic evidence of bias, prejudice, or other motive to testify falsely may be admitted whether or not the witness has been examined about the impeaching fact and has failed to admit it."), *with* Conn. Code Evid. § 6-5 ("The credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely.").

**which might bear on the accuracy and truth of a witness'[s] testimony**." (Emphasis added). *See also Billodeau v. State*, 277 S.W.3d 34, 42–43 (Tex. Crim. App. 2009) ("The possible animus, motive, or ill will of a prosecution witness who testifies against the defendant is never a collateral or irrelevant inquiry, and the defendant is entitled, subject to reasonable restrictions, to show any relevant fact that might tend to establish ill feeling, bias, motive, interest, or animus on the part of any witness testifying against him.").

The State challenges the implied threat's relevance, claiming the defense failed to prove the timing between the threat and K.C.'s complaint of abuse. It highlights the nine-month gap between K.C. leaving the Devincentz household and making her abuse claim, which the State views as too distant to show K.C.'s bias at the time of the allegations. The State points to *Harmony v. State*, 88 Md. App. 306, 322 (1991), and emphasizes that evidence of a victim's alleged bias is irrelevant without a showing that "the victim was biased against the [defendant] *at the time* she first made the supposedly false accusations." (Emphasis in original).

The State's reliance on *Harmony* is misplaced. *Harmony*'s 14-year-old niece accused him of sexual abuse taking place over a period of approximately eight years, from 1980 to 1988. *Id.* at 312. Harmony sought to have his wife testify that the victim complained to her about a lack of attention **after** reporting an incident of alleged abuse in 1988, on the theory that this testimony showed the victim's motivation to lie about abuse for attention. *Id.* at 322. The Court of Special Appeals explained that "[t]o be relevant, the proffered evidence itself must be relevant to the alleged bias." *Id.* Because the alleged

33

conversation occurred **after** the victim reported abuse, the intermediate appellate court concluded it was irrelevant and therefore inadmissible. *Id.*

Here, even the State agrees that "the alleged threat was made before the allegation of sexual abuse."[18] Unlike the timing of the statement in *Harmony*, the timing of K.C.'s statement rendered it relevant to Devincentz's defense. *See id.* at 322. The State's theory of bias proposes a more stringent temporal relationship between bias and the evidence at trial. The question is not necessarily **when** the alleged bias arose, but whether the evidence is **relevant** to the alleged bias in the **particular case**.[19] *Pantazes*, 376 Md. at 693 (must establish that witness has bias or motive to lie in a particular case, or show prejudice against defendant, partiality towards State, or interest in litigation); *Harmony*, 88 Md. App. at 322; *see also* 6 McLain, *supra*, at § 607:2, at 531 ("[T]o be relevant under this impeachment prong of 'bias' or 'motive to testify falsely,' the proffered evidence must show such a bias or motive in the case at hand.").

Here, K.C.'s dislike of Devincentz and the intensity of their arguments was relevant to show that she was biased against him and could have motive to lie. *See* Md. Rule 5-401; *Pantazes*, 396 Md. at 692–93. Joshua testified that K.C. was "yelling and screaming

---

[18] Testimony from multiple witnesses established the timing of K.C.'s statements.

[19] Stale evidence may lead to a conclusion that evidence of bias is too distant to be relevant under some circumstances. In *Biggs v. State*, 56 Md. App. 638, 647 (1983), the Court of Special Appeals concluded that a trial judge did not err in excluding evidence that the witness was biased against Biggs approximately eight to ten years earlier when there was no evidence that "such bias continued and existed" at the time the witness testified. Timing was, at most, a secondary consideration in the Court's decision. It had already determined that testimony about the witness's bias was a veiled attempt to impermissibly introduce the evidence of specific bad acts by the witness. *Id.* at 646.

34

and saying things that she could do that would get [Devincentz] in trouble." We also observe that Joshua did not detail the **contents** of K.C.'s implied threats—only that she had made them. K.C.'s statement is significant because her implied threat was "evidence of animus that might show a motive for making false allegations . . . ." *Calabrese*, 902 A.2d at 1055. As such, its use for impeachment purposes under Md. Rule 5-616(b)(3) was not hearsay because Devincentz offered it for the fact that K.C. **made** the statement—not for its truth. *Smith*, 273 Md. at 161.[20]

We hold that the Circuit Court erred in excluding Joshua's testimony.[21] Next we turn to the question of harmless error.

---

[20] Because Joshua's testimony was not hearsay, we do not reach the parties' arguments about whether the statement satisfied the "state of mind" exception to the prohibition on hearsay set forth in Md. Rule 5-803(b)(3).

[21] The State argued that any limited probative value of Joshua's opinion about K.C.'s truthfulness, as well as his testimony that she was "saying things that she could do that would get [Devincentz] in trouble[,]" was outweighed by the risk of undue prejudice, confusion, and unnecessary cumulative evidence. Maryland Rule 5-403 provides that otherwise relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Prejudice "means 'an undue tendency to persuade the jury to decide the case on an improper basis, usually an emotional one.'" *Parker v. State*, 185 Md. App. 399, 438–39 (2009) (quoting *Weiner v. State*, 55 Md. App. 548, 555 (1983)). Because the evidence the State presented was solely based on testimony, the probative value of testimony addressing the credibility and potential bias of the State's primary witness was a critical matter for the jury. *See Jackson v. State*, 340 Md. 705, 721 (1995) (emphasis in original) ("Where credibility is the central issue, the probative value of impeachment is great, and thus weighs heavily against the danger of *unfair* prejudice.").

**Harmless Error**

Here, the State objected to—but did not move to strike—Joshua's testimony. When a trial court sustains such an objection without a motion to strike, the testimony has technically not been excluded from the record. *See Mack v. State*, 300 Md. 583, 603 (1984), *abrogated on other grounds by Price v. State*, 405 Md. 10 (2008). The proponent of such testimony may nonetheless suffer prejudice for two reasons. First, as happened here, the proponent will reasonably assume he should not argue the significance of the testimony to the jury in closing. Second, the jury may reasonably infer that it could not consider the testimony in light of the sustained objection. Here, the jury instructions did not clarify this fine, but significant, point of procedure. Finally, the parties have consistently characterized the effect of the trial court's action as exclusionary.

To determine whether the exclusion of Joshua's testimony was harmless error, we apply the test set forth in *Dorsey v. State*, 276 Md. 638, 659 (1976):

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of— whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

"[O]nce error is established, the burden falls upon the State . . . to exclude this possibility beyond a reasonable doubt." *Dionas v. State*, 436 Md. 97, 108 (2013).

We apply the harmless error standard without encroaching on the jury's domain. *Id.* at 109. In a criminal case, the jury is the trier of fact and bears the responsibility "for

36

weighing the evidence and rendering the final verdict." *Id.* Assessing a witness's credibility and deciding the weight to be assigned to that witness's testimony are tasks solely delegated to the jury. *Fallin v. State*, __ Md. at __, 2018 WL 3410022, at *12; *Bohnert v. State*, 312 Md. 266, 277 (1988).

Maryland courts have recognized that "where credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a witness'[s] credibility is not harmless error." *Dionas*, 436 Md. at 110; *see also Martin v. State*, 364 Md. 692, 703 (2001); *Howard v. State*, 324 Md. 505, 517 (1991); *Wallace-Bey v. State*, 234 Md. App. 501, 546 (2017).

The proper inquiry in applying the harmless error test is not to consider the sufficiency of the State's evidence, excluding Joshua's testimony, but "whether the trial court's error was unimportant in relation to everything else the jury considered in reaching its verdict." *Dionas*, 436 Md. at 118. In its opening statement, the State told the jury that "all the evidence" they would hear is "the testimony of K.C. and others." The prosecutor explained that "[i]t's typical for a case of this nature to be a [']he said she said['] type of case, where it's based on credibility of witnesses." Defense counsel maintained that K.C. had ulterior motives for making allegations against Devincentz. Joshua's testimony was intended to undermine K.C.'s credibility by offering an opinion that she was untruthful and provide evidence that K.C. was biased against Devincentz.

The State views the excluded evidence as cumulative and less compelling than the other evidence presented at trial from which the jury could have concluded that K.C. was not telling the truth, or that she was biased against Devincentz. But in its closing statement

and rebuttal, the State argued that this evidence demonstrated that K.C. was "insightful and consistent" and corroborated her account.

The outcome of this case turned entirely on the relative credibility of the defendant and the accuser. As Devincentz points out, "the only task for the jury was to determine whether it believed [K.C.]." By excluding Joshua's testimony, the trial court limited the jury's ability to assess K.C.'s credibility and potential bias. For that reason, the exclusion of Joshua's testimony on those issues was not harmless error, and we reverse the decision of the Court of Special Appeals, vacate Devincentz's convictions, and remand for a new trial. *Dionas*, 436 Md. at 110.

## CONCLUSION

We reject the State's preservation argument. We hold that the trial court erred in excluding Joshua's opinion about K.C.'s character for untruthfulness because character evidence was relevant to the proceeding, and Joshua had an adequate basis to offer the opinion. We also hold that the trial court erred in excluding Joshua's testimony that K.C. was saying things that she could do to get Devincentz in trouble during a fight because it was offered, not for the truth of the matter asserted, but as nonhearsay impeachment evidence offered for the fact that the statement was made. The exclusion of this testimony was not harmless because these errors affected the jury's ability to assess K.C.'s credibility.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR ENTRY OF AN ORDER VACATING PETITIONER'S CONVICTIONS AND REMANDING THE CASE TO THE CIRCUIT COURT FOR CECIL COUNTY**

38

**FOR A NEW TRIAL.  COSTS TO BE PAID BY RESPONDENT.**

Circuit Court for Cecil County
Case No. 07-K-15-001678

Argued: April 9, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 74

September Term, 2017
_____

JULIUS DEVINCENTZ, JR.

v.

STATE OF MARYLAND
_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.
_____

Concurring and Dissenting Opinion by Watts, J.
_____

Filed: August 13, 2018

Respectfully, I concur and dissent. Although I agree with the Majority that Julius Devincentz, Jr., Petitioner, preserved the instant issues for appellate review, I disagree with the Majority's resolution of the merits. See Maj. Slip Op. at 6-7. I would hold that the Circuit Court for Cecil County did not err or abuse its discretion in sustaining the prosecutors' objections to Joshua Devincentz ("Joshua")'s testimony—namely, that the alleged victim, K.C., "would not tell the truth about certain things[,]" and that K.C. was "saying things that she could do that would get [Devincentz] in trouble." In my view, both instances of Joshua's testimony were inadmissible.

Joshua's testimony—that K.C., "would not tell the truth about certain things"—was not admissible under Maryland Rule 5-608(a)(1) or Maryland Rule 5-405(a). Maryland Rule 5-608(a)(1) provides: "[A] character witness may testify (A) that the witness has a reputation for untruthfulness, or (B) that, in the character witness's opinion, the witness is an untruthful person." Maryland Rule 5-405(a) states: "In all cases in which evidence of character . . . of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion." Joshua was not asked whether K.C. had a reputation for being untruthful, or whether, in his opinion, K.C. was an untruthful person, and he did not testify as such. To the contrary, in response to a question as to whether K.C. had "problems" with her family members other than Devincentz, Joshua testified, among things, that K.C. "would not tell the truth about certain things." At best, it is unclear whether Joshua intended to testify regarding specific instances of untruthfulness by K.C., was passing on hearsay information about K.C., or simply speculating for no reason at all that K.C. would not tell the truth about certain things. The contention that Joshua was

attempting to give testimony about K.C.'s reputation for untruthfulness, or to give "personal opinion testimony" about K.C. being an untruthful person, is based wholly on conjecture and is without merit.

Devincentz's counsel did not attempt to elicit from Joshua that, in his opinion, K.C. was an untruthful person, or that K.C. had a reputation for untruthfulness. Such testimony would have been admissible under Maryland Rules 5-608(a)(1)(A) and (B) and 5-405(a). It is evident that Devincentz's counsel did not ask for, and Joshua did not give, testimony as to his opinion of K.C. as an untruthful person or her reputation. Instead, Devincentz's counsel asked Joshua to describe K.C.'s "problems" with her family members other than Devincentz; and, after being asked that question, Joshua testified, at the end of a list of other things, that K.C. "would not tell the truth about certain things."[1]

The Majority improperly concludes that Joshua's testimony was "a personal opinion[.]" Maj. Slip Op. at 18. In reaching this conclusion, the Majority simply states:

> As we explained in *Kelley v. State*, 288 Md. 298, 302[, 418 A.2d 217, 219] (1980), [Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol.) ("CJ")] § 9-115 "permits the admission of a broad range of testimony[,] which may aid the jury in assessing the credibility of a witness . . . ." The State has not offered Maryland authority showing that it is necessary to phrase questions or opinions as it proposes. For that reason, we conclude that Joshua offered an opinion about K.C.'s character for truthfulness.

---

[1]In this part of Joshua's testimony, Devincentz's counsel asked Joshua whether K.C. "had problems not only with [Devincentz,] but [also] with other people in the family[.]" Joshua responded: "Yes." Devincentz's counsel asked Joshua: "Would you describe what you mean by that?" Joshua responded: "[K.C.] had a problem with her mouth. [K.C.] would say things to people, about people, and then she would like to argue with you. And [K.C.] would not tell the truth about certain things."

Maj. Slip Op. at 16-17 (footnotes omitted) (last alteration and ellipsis in original). To point out that the Majority's reasoning is flawed would be an understatement. CJ § 9-115 provides in pertinent part: "Where character evidence is otherwise relevant to the proceeding, no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character[.]" Contrary to the majority opinion's conclusions, CJ § 9-115 does not apply, given that it is not evident that Joshua was rendering an opinion; whether Joshua had an adequate basis for forming an opinion is not at issue.

Likewise, the Majority's attempt to use this Court's opinion in <u>Jensen v. State</u>, 355 Md. 692, 736 A.2d 307 (1999) to justify admission of Joshua's testimony is wrong. <u>See</u> Maj. Slip Op. at 16. This Court's holding in <u>Jensen</u> could not be more distinguishable from the circumstances of this case. The key distinction is that, in <u>Jensen</u>, 355 Md. at 697, 736 A.2d at 310, the defendant's counsel asked the character witness for her opinion about the State's witness's veracity, and the character witness responded that she thought that the State's witness was "a compulsive liar." Against this background, this Court held that the trial court abused its discretion in not admitting the character witness's testimony as to her acquaintance with the State's witness and her opinion that he was a compulsive liar. <u>Id.</u> at 708, 736 A.2d at 315. Prior to expressing the opinion that the State's witness was a compulsive liar, outside of the jury's presence, the character witness responded "Yes" to the question: "Would [the State's witness] tell you inconsistent stories about different things?" <u>Id.</u> at 696, 736 A.2d at 309. The character witness also explained that "[a] lot of

the stories that [the State's witness] told [her] didn't add up," in that, on multiple occasions, "one day[,] he would tell [her] something that happened on that day[,] and then[,] a couple days later[,] he would tell [her] something else that had happened on that day that wouldn't have been able to happen if what he said before was true." Id. at 697, 736 A.2d at 309. After the character witness testified, in response to defense counsel's question seeking her opinion, that the State's witness was a compulsive liar, the defendant's counsel asked: "What do you base that opinion on?" Id. at 697, 736 A.2d at 310. The prosecutor made an objection, which the trial court sustained. See id. at 697, 736 A.2d at 310.

In Jensen, id. at 708, 736 A.2d at 315, this Court held that, where a character witness renders an opinion as to a witness's truthfulness or untruthfulness, the character witness is "entitled to some latitude in informing the jury as to the basis for an opinion, so long as that person avoids venturing into the troublesome area of specific instances." The critical distinction is that Jensen's counsel expressly sought, and the character witness unequivocally provided, her opinion of the State's witness's character for truthfulness. See id. at 697, 736 A.2d at 310. This Court recognized that Maryland Rule 5-608 did not prohibit the character witness from providing information about a reasonable basis for the opinion on direct examination. See id. at 707, 736 A.2d at 315. This Court explained that the character witness

> was not testifying as to a particular incident; she was testifying, as a general matter, to [the State's witness's] tendency to tell mutually inconsistent stories, *i.e.*, his general tendency to be untruthful. Nor was [the character witness's] testimony "no more than a number of specific events tied together." [The character witness] was not testifying as to several particular instances of conduct; she was testifying as to a general behavior pattern [that[ was the basis for her opinion that [the State's witness] was untruthful.

<u>Id.</u> at 699, 736 A.2d at 310-11 (cleaned up).

By contrast, here, Devincentz's counsel did not ask for, and Joshua did not give, testimony as to his opinion of K.C. as an untruthful person or her reputation. Nor did Joshua testify that K.C. had a "general behavior pattern" of being untruthful. Joshua simply testified that K.C. was untruthful "about certain things." Obviously, character testimony need not be given in specific or formulaic phrases. The problem with Joshua's testimony is not that he failed to use particular words; the problem is that, unlike the witness in <u>Jensen</u>, Joshua was never asked and never testified, in any way, about whether he had an opinion as to K.C.'s untruthfulness. Joshua's testimony—that "[K.C.] had a problem with her mouth. [K.C.] would say things to people, about people, and then she would like to argue with you. And [K.C.] would not tell the truth about certain things"—in no way satisfied the requirements of Maryland Rules 5-608(a)(1)(A) and (B) and 5-405(a).

Similarly, I would hold that the circuit court did not err or abuse its discretion in sustaining the prosecutors' objections to Joshua's testimony that K.C. was "saying things that she could do that would get [Devincentz] in trouble." Devincentz was not entitled to offer K.C.'s statement as evidence of alleged bias against him under Maryland Rule 5-616(b)(3). Maryland Rule 5-616(b)(3) states: "Extrinsic evidence of bias, prejudice, interest, or other motive to testify falsely may be admitted whether or not the witness has been examined about the impeaching fact and has failed to admit it." Maryland Rule 5-616(b)(3) establishes that a witness need not be confronted with, and have failed to admit, evidence of bias, prejudice, interest, or other motive to testify falsely for such evidence to

be found admissible. As such, Maryland Rule 5-616(b)(3) establishes only that such evidence may be admitted without the requirements set forth in Maryland Rule 5-613(a) and (b) that the evidence be disclosed to the witness, the witness have an opportunity to deny or explain same, and the witness failed to admit having made the alleged statement. Maryland Rule 5-616(b)(3) does not override Maryland Rule 5-802, which provides that hearsay is inadmissible "[e]xcept as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes[.]" In other words, Maryland Rule 5-616(b)(3) does not provide that evidence of bias shall be automatically admitted, regardless of whether the evidence is hearsay or otherwise subject to exclusion under the Maryland Rules, *i.e.*, Joshua's testimony regarding K.C.'s statement was not exempt from the rule against hearsay simply because the alleged statement potentially pertained to K.C.'s bias against Devincentz.

K.C.'s statement was hearsay because Devincentz offered it to prove the truth of the matter asserted—namely, that K.C. could, in fact, do "things . . . that would get [Devincentz] in trouble." At trial, Devincentz's theory of the case was that K.C. had falsely accused him of abuse because she wanted to leave his household. During Devincentz's opening statement, his counsel informed the jury that the reason that the charges were brought was that K.C. had an agenda, that she wanted to live with her biological father, and that Devincentz and her mother blocked her effort. Similarly, Devincentz's counsel stated during closing argument that: "[K.C.] wanted to live somewhere else. [K.C.] wanted away from this household. [K.C.] wanted away from [] Devincentz. And guess what. [K.C.]'s there. If [K.C.] hadn't made these allegations, she wouldn't be there." Clearly,

- 6 -

Joshua's testimony that K.C. was "saying things . . . that would get [Devincentz] in trouble" directly supported Devincentz's theory of the case. Specifically, Joshua's testimony was offered as proof of Devincentz's position that K.C.'s allegation of abuse was an attempt to get him "in trouble" so that she could leave his household. Simply put, Devincentz's counsel did not assert that K.C. fabricated her allegations of abuse because she disliked Devincentz or was biased against him. Devincentz's counsel set forth a theory of the case that K.C. falsely accused him of abuse because she wanted to leave his household, and introduced Joshua's testimony to prove the point. There is no Maryland case law that supports the proposition that, where a witness provides testimony in support of a defendant's theory of the case, the testimony may be interpreted not to be proof of the truth of the matter asserted, but rather evidence of the witness's bias.

The Majority opines that Devincentz offered K.C.'s statement not to prove that she could get him in trouble, but instead as impeachment evidence. See Maj. Slip Op. at 35. The Majority cites Lynn McLain, *Maryland Evidence, State & Federal*, 6A Maryland Evidence, § 801:13 (3d ed. 2013), which states in pertinent part: "A witness's out-of-court statements [that are] offered not as substantive proof[,] but for purposes of impeachment or rehabilitation of the witness's credibility[,] are not hearsay." Maj. Slip Op. at 30. The Majority also cites Smith v. State, 273 Md. 152, 161, 328 A.2d 274, 279 (1974) and Handy v. State, 201 Md. App. 521, 540, 30 A.3d 197, 208 (2011), cert. denied, 424 Md. 630 37 A.3d 318 (2012), in which the Court of Special Appeals quoted substantively identical language in an earlier version of *Maryland Evidence, State & Federal*. See Maj. Slip Op. at 30. The principle espoused in *Maryland Evidence, State & Federal*, Smith, and Handy

- 7 -

does not apply here. K.C.'s statement that she could do things to get Devincentz in trouble was evidence that she did exactly what he contended at trial that she did—namely, make up an allegation of abuse so that she would move out of his household. Devincentz did not offer K.C.'s statement to impeach her—*i.e.*, to show that she was generally untruthful. To the contrary, Devincentz's position was that K.C.'s statement was true—that she, in fact, did something to get him in trouble, in the form of falsely accusing him of abuse.

Similarly, I would conclude that K.C.'s statement is not subject to the then-existing mental, emotional, or physical condition hearsay exception, *i.e.*, the "statement of intent" hearsay exception, which generally applies to "[a] statement of the declarant's then[-]existing state of mind . . . (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then[-]existing condition or the declarant's future action[.]" Md. R. 5-803(b)(3). A statement is not subject to the "statement of intent" hearsay exception where the statement is too "remote[] in time" from the future action that the declarant stated that he or she would take. McCray v. State, 305 Md. 126, 140-41, 501 A.2d 856, 863 (1985). Because "the duration of states of mind or emotion varies with the particular attitudes or feelings at issue and with the cause," the time between the declarant's statement of intent and the declarant's action must be short enough for there to be "some probability" that the declarant's state of mind when he or she made the statement of intent was the same by the time that the declarant took the future action that he or she stated that he or she would take. Robinson v. State, 66 Md. App. 246, 258, 503 A.2d 725, 731, cert. denied, 306 Md. 289, 508 A.2d 489 (1986) (citation omitted). As the Honorable Charles E. Moylan, Jr. aptly explained in Robinson, 66 Md. App. at 258, 503 A.2d at 731, "[t]he

case law legitimizing the admission of [statement]s based upon [a] 'notion of the continuity in time of states of mind' almost universally imposes very tight limits on the lapse of time [that is] involved." By way of illustration, in <u>Robinson</u>, <u>id.</u> at 258, 503 A.2d at 731, the Court of Special Appeals held that a defendant's statement that she wanted to buy a gun to protect herself was not subject to the "statement of intent" hearsay exception where the defendant made her statement approximately one month before shooting the victim.

Like in <u>Robinson</u>, <u>id.</u> at 258, 503 A.2d at 731, K.C.'s statement is not subject to the "statement of intent" hearsay exception because it was too remote in time from the action that K.C. stated that she would take—*i.e.*, doing "things . . . that would get [Devincentz] in trouble." Joshua did not specify when K.C. made the alleged statement. Given that K.C.'s statement occurred during, or shortly after, an argument between her and Devincentz, the statement must have occurred while K.C. lived at Devincentz's house. Thus, K.C.'s statement apparently occurred sometime during the approximately six-and-a-half years between October 2008, when she moved into Devincentz's house, and April 2015, when K.C. moved out of Devincentz's house. The length of this timeframe is considerable, and strongly weighs in favor of a determination that K.C.'s statement was far too remote in time from the future action that K.C. allegedly indicated that she would take.

Even if Devincentz is given the benefit of the doubt, and it is assumed that K.C.'s statement occurred right before she moved out of Devincentz's house in April 2015, that leaves approximately five months between April 2015 and September 17, 2015, when K.C. told her therapist that Devincentz had abused her. A statement of intent that a declarant makes approximately five months before the action that he or she stated that he or she

would take is too remote in time to be subject to the "statement of intent" hearsay exception. If approximately one month is too long a timeframe, see Robinson, 66 Md. App. at 258, 503 A.2d at 731, then approximately five months certainly is far too lengthy. Even if Devincentz had established that K.C.'s statement occurred right before she moved out of his house—which, again, he did not—K.C.'s statement would still be too remote in time to qualify for the "statement of intent" hearsay exception.[2]

In addition to the significant timeframe between K.C.'s statement and her allegation of abuse, the circumstances under which K.C. first alleged abuse indicate that the "statement of intent" hearsay exception is inapplicable. Devincentz's theory of the case was that K.C. falsely accused him of abuse so that she could leave his household—i.e., stop living with him. K.C.'s allegation of abuse, however, did not occur while K.C. was living in Devincentz's house. Instead, K.C.'s allegation of abuse occurred while K.C. was living at the residential program at the Maryland Salem Children's Trust. As such, K.C. no longer had the need to make an allegation of abuse to change her living arrangements with Devincentz. Additionally, K.C. made her allegation of abuse not to a law enforcement officer, but instead to a therapist. Thus, the method through which K.C. alleged abuse did not demonstrate an intent to get Devincentz "in trouble," but rather demonstrated that K.C. sought treatment for the alleged abuse. These circumstances, like the attenuation in time

---

[2]Nor was K.C.'s statement exempt from the hearsay rule under Maryland Rule 5-803(b)(3) as a statement of her then-existing state of mind. Just as K.C.'s alleged statement was too remote in time to be evidence of a future action consistent with the statement, the statement was made too long ago to be evidence of K.C.'s state of mind at the time that she first reported the alleged abuse to her therapist.

between the statement and K.C.'s report of Devincentz's alleged abuse to her therapist, lead to the conclusion that the "statement of intent" hearsay exception does not apply, and that the circuit court properly excluded Joshua's testimony that K.C. was "saying things that she could do that would get [Devincentz] in trouble."

In my view, the majority opinion effectively eviscerates the requirements of Maryland Rules 5-608(a)(1)(A) and (B) and 5-405(a), and leads to a situation in which any time a witness utters testimony referring to another witness, with whom he or she is familiar, as not truthful that testimony would be construed to be "a personal opinion" and admissible. And, the majority opinion disregards the rules with respect to hearsay evidence. Although, as the majority opinion states, "the trial of any case is a search for truth," Maj. Slip Op. at 1, fundamental fairness dictates that the rules of evidence be adhered to. Respectfully, for all of these reasons, I concur and dissent.